IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KELLY L. ASHTON and
WILLIAM A. HELTON,

                    Plaintiffs,

          vs.                                    Case No. 11-4002-SAC

NATIONAL FARMERS UNION
PROPERTY AND CASUALTY
COMPANY,

                    Defendant.


MEMORANDUM AND ORDER

          The case comes before the court on the parties' cross-motions

for summary judgment.  (Dk. 44 and 46).  Kelly Ashton and William Helton,

sued in state court for their serious injuries sustained in a car accident with

a 1988 Chevrolet Camaro driven by the fifteen-year-old Jacob Valek but

owned by Jacob's father, William Valek.  In 2009, the state district court in

Republic County, Kansas, entered a judgment for William Helton against

William Valek for $306,252.69 and a judgment for Kelly Ashton and against

William Valek for $2,283,655.14.  Farm Bureau Insurance issued a policy to

William Valek on the 1988 Chevrolet Camaro with policy limits of $100,000

per person and $300,000 per occurrence, and it defended this lawsuit.  Prior

to the state district court judgments, Kelly Ashton and William Helton

reached an agreement with William Valek and the Estate of Jacob Valek

("Valeks") resulting in an assignment of rights and covenant-not-to-sue.

William Valek assigned his rights and causes of action for coverage against National Farmers Union Property and Casualty Company ("NFU") under insurance policies issued to him.  Kelly Ashton and William Helton ("the plaintiffs") bring this bad faith insurance claim assigned to them seeking payment of an excess judgment against the defendant NFU for its denial of coverage on two insurance policies issued to William Valek.

The plaintiffs ask for oral argument on their motion for summary judgment pursuant to D. Kan. Rule 7.2.  The plaintiffs acknowledge "[t]his is not a complicated case," and they give the court no reasons for how oral argument would assist the court in its decision.  The court denies the request for oral argument.

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one which would affect the outcome of the claim or defense under the governing law.  *Id*.  "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

2

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law.  *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992).  Instead of disproving a claim or defense, the movant need only show "a lack of evidence" on an essential element.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  If the movant meets that burden, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's favor.  *Id*.   The non-movant's "burden to respond arises only if the" movant meets its initial burden of production.  *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005) (citation omitted).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251–52.  Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

**STATEMENT OF FACTS**

Just after midnight on August 11, 2007, the plaintiffs were driving south on US-81 when an 1988 Chevrolet Camaro eastbound on Fir Road failed to stop at the intersection and crashed into the passenger side of their vehicle.  The Camaro's driver was Jacob Valek, a fifteen-year-old who had a limited use farm permit for driving.  Jacob had a blood alcohol level of .02 which is an unlawful level under Kansas law for a person his age.  From this violent collision, Jacob Valek was killed, Kelly Ashton was rendered a paraplegic, and William Helton was seriously injured.

The Camaro involved in the accident was owned and registered to William Valek.  His son, Jacob, had obtained the limited use driving farm permit because of his work on the family farm.  Earlier that evening, when asked, William had given his son, Jacob, permission to drive the Camaro to town to visit friends.  Driving on a highway under these circumstances did not come within the lawful operating authority of Jacob's limited use farm permit.

William Valek had insured the Camaro and his other personal or family vehicles with Farm Bureau.  He separately insured his farm business vehicles and his farm operations with NFU.  After the accident, Farm Bureau paid the policy limits to the plaintiffs, and NFU denied coverage under its policies.

4

NFU issued an automobile policy [No. 1PA0016598] to William

Valek and his brother, Mickey J. Valek.  The vehicles identified in this auto

policy were used for farming operations.  The Camaro is not named on this

policy.  NFU also issued a farm policy [No. 1FO0008116] to Marcella Valek &

Sons.  Both policies were in effect on August 11, 2007.

In January of 2009, William Helton filed suit against the estate of

Jacob Valek in state district court, and Kelly Ashton filed her suit against the

estate in February of 2009.  After taking the depositions of William and

Teresa Valek, the plaintiffs amended their state court petitions adding

William Valek as a party defendant.  The petitions alleged in relevant part:

> Defendant Bill Valek knowingly (1) permitted Jake Valek, a minor
> under the age of sixteen years, to drive Bill Valek's Camero upon a
> highway;  (2) permitted his son, Jake Valek, who was under the age of
> eighteen years to drive a motor vehicle upon a highway when his son
> was not authorized under the Kansas Driver's License Act; and (3)
> knowingly permitted a motor vehicle owned by him to be driven upon
> any highway by Jake Valek, who was not authorized under the Kansas
> Driver's License Act.  Defendant Bill Valek is therefore jointly and
> severally liable with Jake Valek for any damages caused by the
> negligence of Jake Valek in driving said vehicle.  Defendant Bill Valek
> is additionally negligent for negligently entrusting his Camero to Jake
> Valek.

(Dk. 47, Ex. J, ¶ 9).

Counsel for the plaintiffs sent a letter dated July 24, 2009, to

NFU citing both policy numbers and making the following demand:

> Please find enclosed with this letter documents in support of my
> demand for your policy limits of $300,000.00 per person, $600,000.00
> per accident. Your insured, Bill Valek, has been deposed and

5

acknowledged that he negligently entrusted his automobile to his son,
Jacob Valek, on August 11, 2007. . . .
        . . .
        The injuries to the three individuals in this case far exceed $4.5
million.  We are giving you 30 days to tender your $600,000.00 limits
in full and final release of Bill Valek.

(Dk. 45, Att. 8).  While plainly characterizing his demand as being for "your

[NFU] policy limits," the plaintiffs' letter erroneously stated the policy limits.

NFU had not issued any policy to William Valek with policy limits of

$300,000.00 per person and $600,000.00 per accident.

        On August 14, 2009, the NFU senior claim representative Jan

LeDoux sent a letter addressed to the insured Valek denying coverage under

both policy.  The letter summarizes the investigation leading to the denial of

coverage:

        Our investigation included reviewing the facts of the accident via
        information provided by Mr. Leatherman, discussions with your
        Farmers Union agent, discussions with our Underwriting department,
        discussions with Farm Bureau Insurance and a complete review of the
        applicable personal automobile and farm policy with referenced above.

(Dk. 47, Ex. L).  Jan LeDoux's notes reflect that she spoke about the claim

with Larry Bork, the attorney retained by State Farm to represent the estate

of Jacob Valek.  (Dk. 45, Att. 10).  Randall West, a Claims Program Manager

with NFU, reviewed Ms. LeDoux's investigative findings and approved her

recommendation to deny coverage.

        Ms. LeDoux's letter states specific reasons for NFU's denial of

coverage under both policies.  After quoting the definition of "insured car"

6

found in the auto policy, the letter concludes that:  "Because the Camaro was never added to the above referenced policy, it does not qualify as an 'insured car' and therefore incidents arising out of its use would not be covered."  *Id*.  The letter next quotes from the farm policy the exclusion for "bodily injury" arising out of "use or entrustment" of any motor vehicle and concludes:  "Use of motor vehicles and entrustment of a motor vehicle is excluded under the farm policy.  Therefore, the farm policy would also not provide coverage of the above referenced incident."  *Id*.

In November 2009, the plaintiffs and the Valeks executed an assignment of rights and covenant not to execute.  The parties agreed "to try the case to District Judge Kim Cudney of the Republic County District Court" based on the evidence listed therein.  Additionally, the Valeks assigned their rights and causes of action as the insureds under the NFU auto and farm policies.  The plaintiffs also covenanted that they would not execute on the Valeks' personal assets or property.

After the bench trial on December 23, 2009, Judge Cudney entered a journal entry of judgment finding that "Defendant Jacob Valek is 95% at fault for the collision of August 11, 2007 . . . and that Defendant Valek's negligence is imputed upon defendant William Valek via operation of K.S.A. § 8-222."  (Dk. 45, Ex. 16, p. 12 and Ex. 17, p. 16).  Judge Cudney also concluded "that Defendant William Valek is 5% at fault for negligently

entrusting the Camaro to defendant Jacob Valek." *Id.* For the plaintiff

Ashton, Judge Cudney ordered "that the Estate of Jacob Valek and William

Valek, jointly and severally, pay $2,169,472.39 and that William Valek pay

$114,182.75 for damages for injuries." (Dk. 45, Ex. 16. P. 12). For the

plaintiff Helton, Judge Cudney ordered "that the Estate of Jacob Valek and

William Valek, jointly and severally, pay $290,940.06 and that William Valek

pay $15,312.63 for damages for injuries." (Dk. 45, Ex. 17, pp. 16-17).

**ARGUMENT AND ANALYSIS**

As laid out in the pretrial order, the plaintiffs claim:

> Defendant breached its duty to act in good faith and without
> negligence when it denied coverage to William Valek without: (1)
> conducting an adequate investigation into the possibility of coverage;
> (2) offering to defend its insured under reservation of rights; (3)
> attempting to settle the liability claim in the face of the coverage
> dispute. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261
> Kan. 806, 934 P.2d 65 (1997).

(Dk. 43, p. 7). Both sides agree that the first determination on a bad faith

claim is whether coverage exists under the policy. (Plaintiffs' Memo. Dk. 47,

p. 15; Defendant's Memo. Dk. 45, pp.10-11). Kansas law is quite plain that

"[w]hen there is no coverage under the insurance policy, there is no duty to

defend." *South Central Kansas Health Ins. Group v. Harden & Co. Ins.*

*Services, Inc.*, 278 Kan. 347, 353, 97 P.2d 1031 (2004); *see Miller v.*

*Westport Ins. Corp.*, 288 Kan. 27, 33, 200 P.3d 419 (2009) ("The insurer

must defend only actions against insureds that allege claims within the

8

coverage." (internal quotation marks and citation omitted)).  The parties also concur that the liability at issue is both William Valek's negligent entrustment and William Valek's joint and several liability for a minor under K.S.A. § 8-222.  There seems to be no question but the coverage issues can be decided on the parties' summary judgment motions.  The court will determine whether NFU's auto policy or its farm policy offers coverage for either kind of liability.

Coverage under NFU Auto Policy

The parties agree the contract terms at issue are found in the Coverage A-Liability Coverage of the Kansas Amendatory Endorsement that provides in relevant part:

> **We** will pay damages for **bodily injury** or **property damage** for which any **insured person** becomes legally responsible because of a car accident. . . . We have no duty to defend any suit or settle any claim for **bodily injury** or **property damage** not covered under this policy.

> **Insured person** as used in this Part means:

> 1. **You** or any **relative** for the ownership, maintenance or use of any **car** or **utility trailer**.
> 2. Any person using your **insured car** with **your** express or implied consent.
> 3. For **your insured car**, any person or organization, but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this Part.
> 4. For any **car** or **utility trailer**, other than **your insured car**, any person or organization but only with respect to legal responsibility for acts or omissions of **you** or any **relative** for whom coverage is afforded under this Part.  This provision

9

applies only if the person or organization does not own or hire the **car** or **utility trailer**.

. . . .

**EXCLUSIONS**

A.  **We** do not provide Liability Coverage for any person:
. . . .
9.  Who is a **relative**, to the extent the **LIMITS OF LIABILITY** of this policy exceed the **LIMITS OF LIABILITY** required by law.

B.  **We** do not provide Liability Coverage for the ownership, maintenance or use of:
. . . .
2.  Any vehicle, other than **your insured car**, which is:
   a.  Owned by **you**; or
   b.  Furnished or available for **your** regular use.

(Dk. 45, Ex.5, pp. NFU 217-219).

*Coverage for K.S.A. § 8-222 Joint and Several Liability*

William Valek's liability here arises from the following Kansas

statute:

Every owner of a motor vehicle causing or knowingly permitting a minor under the age of sixteen years to drive such vehicle upon a highway, and any person who gives or furnishes a motor vehicle to such minor, shall be jointly and severally liable with such minor for any damages caused by the negligence of such minor in driving such vehicle.

K.S.A. § 8-222.  The Kansas Supreme Court has construed this statute to

have the effect of "imput[ing] the negligence of such minor driver to one

who knowingly permits the minor to drive the motor vehicle." *Yetsko v.*

*Panure*, 272 Kan. 741, Syl ¶ 1, 35 P.3d 904 (2001).  "[U]nder the statute

the liability of the owner arises from the negligence of the minor who is

permitted to drive." *Id.* at 747 (internal quotation marks and citations omitted).  This construction serves the legislative intent of making "those persons liable who permit a minor under 16 years of age to drive a motor vehicle" by "imputing the negligence of the minor driver to the consenting adult." *Id.* at 750.  Thus, as the consenting adult, William Valek's joint and several liability under K.S.A. § 8-222 arises from being imputed with the minor Jacob Valek's negligence in operating the 1988 Camaro.  The theory of William Valek's liability is not based on his own negligence or wrong independent of Jacob's use of the vehicle.  *Cf. Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 329, 961 P.2d 1213 (1998) ("Where a policy seeks to exclude coverage for an accident arising out of the use of an automobile, coverage will still be found if the theory of liability establishes negligence independent of the use of the automobile, which negligence is covered under the policy.")

The plaintiffs argue for K.S.A. § 8-222 to be construed to impose liability on the consenting adult for his own negligence in giving permission to the minor and to treat this consent as a wrong independent of the minor driver's negligence.  Such a reading cannot be squared with the holding in *Yetsko v. Panure*, 272 Kan. 741, 35 P.3d 904 (2001), that the consenting adult is automatically imputed with the minor driver's negligence.  The statute does not condition joint and several liability "on the legality of the

11

minor's driving status" but on the simple fact of the minor's age.  *Id.* at 747.

The statute does not condition the consenting adult's liability on the adult's

permission being "wrong" or on the adult's commission of any additional or

independent "wrong."  While *In re Estate of Bisoni*, 171 Kan. 631, 237 P.2d

404 (1951) does refer to the adult's consent as "negligence," this appears to

be no more than a loose reference to the adult's respective role in triggering

joint and several liability rather than a legal characterization of the adult's

actions or any requirement for liability under the statute.

       Exclusion B.2 excludes liability coverage for "the ownership,

maintenance or use of" a vehicle owned by the insured but not described in

the policy's declarations and not a replacement for a described car.  William

Valek owned the 1988 Camaro, but it was not described in the NFU auto

policy's declarations, and it did not qualify as a replacement for a vehicle

described in that policy.  The plain terms of this exclusion eliminate coverage

for William Valek's joint and several liability under K.S.A. § 8-222 for

damages from a car accident caused by Jacob Valek's negligent use of the

1988 Camaro.[1]  The court finds that NFU is entitled to summary judgment

---

[1] Even if the court had found that William Valek's consent was an
independent wrong not coming within the terms of the exclusion, then by
dint of logic this means the act of giving consent does not come within the
definition of an "insured person" as being "for the ownership, maintenance
or use of any car or utility trailer."  Regarding the plaintiffs' arguments for
avoiding this language, they will be addressed under the following negligent
entrustment section.

on this issue, as it has carried its burden of proving the application of this exclusion.

*Coverage for Negligent Entrustment Liability*

The parties again refer the court to the Kansas Amendatory Endorsement to NFU's auto policy which has an insuring clause that covers "damages for **bodily injury** or **property damage** for which any **insured person** becomes legally responsible because of a car accident."   (Dk. 45, Ex.5, p. NFU 217).  Insured person is then defined as "**You** or any **relative** for the ownership, maintenance or use of any **car** or **utility trailer.**"  *Id.*

NFU puts forward as the plainly stated law in Kansas that a claim for negligent entrustment does not fall within "the ownership, maintenance or use" of a car.  The Kansas Supreme Court has construed an exclusion in a homeowner's policy for the "ownership, maintenance, operation, use" of a vehicle to not encompass the theory of liability on a negligent entrustment claim.  *Upland Mutual Insurance, Inc. v. Noel*, 214 Kan. 145, 150, 519 P.2d 737 (1974).  Because a claim of negligent entrustment is not for liability arising from ownership, maintenance or use of a car and because the 1988 Camaro is not the insured's car under the NFU auto policy, there is no coverage under the express terms of the insuring clause.

In arguing against the application of exclusion B.2, the plaintiffs concede that "William Valek's liability for negligent entrustment does not

13

stem from the 'ownership, maintenance, or use' of the Camaro."  (Dk. 47, p. 24).  The plaintiffs further concede that *Upland* and subsequent decisions recognize that a claim of a negligent entrustment "does not flow from the use, maintenance, or operation of a motor vehicle."  (Dk. 50, p. 8). Nonetheless, the plaintiffs offer several arguments against reading the Kansas Amendatory Endorsement's definition of "insured person" to preclude coverage for negligent entrustment liability.

From the definition of "insured person," that is, "**You** or any **relative** for the ownership, maintenance or use of any car . . .," the plaintiffs emphasize the disjunctive meaning of "or" that separates "you" and "any relative" and then read the later modifying phrase, "for the ownership, . . ., or use of any car," as only applying to the second and separate object, that is, "any relative."  The plaintiffs follow up with the doctrine of the last antecedent seeking to have the modifying phrase construed to impact only the object immediately preceding it.  The plaintiffs urge this reading as consistent with their assumption that the amendatory endorsement changed the original policy's scope of coverage.  Finally, the plaintiffs say their proffered readings of this definition are enough to present an ambiguity in the policy requiring a construction in their favor.

The Kansas Supreme Court has identified the operable rules of construction for interpreting the terms of an insurance policy:

"The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. [Citations omitted.] In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. [Citation omitted.]

"Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. [Citations omitted.] If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. [Citation omitted.] In such case, there is no need for judicial interpretation or the application of rules of liberal construction. [Citation omitted.] The court shall not make another contract for the parties and must enforce the contract as made. [Citations omitted.]

"However, where the terms of an insurance policy are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail. [Citations omitted.]

"'To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.' [Citation omitted.]

"Whether a written instrument is ambiguous is a question of law to be decided by the courts. [Citation omitted.] Courts should not strain to create an ambiguity where, in common sense, there is not one. [Citation omitted.] The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean [Citation omitted.]" *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575–76, 56 P.3d 789 (2002).

*American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058-1059, 179

P.3d 1104 (2008).  With respect to endorsements, the Kansas Court of

Appeals has recognized the following rules of construction:

15

"In construing an endorsement to an insurance policy, the endorsement and the policy must be read together. The policy remains in full force and effect except as altered by the words of the endorsement. Conversely, the endorsement modifies, to the extent of the endorsement, the terms and conditions of the original insurance contract. Reading all provisions together in an attempt to harmonize the terms is particularly appropriate where the preprinted policy form comes to the insured with the various endorsements attached. The attached endorsements only alter the package policy to the extent specifically called for in explicit provisions of the attachments." 4 Holmes' Appleman on Insurance 2d § 20.1, pp. 153–55 (1998).

*Thornburg v. Schweitzer*, 44 Kan. App. 2d 611, 620, 240 P.3d 969, 976 (2010), *rev. denied*, 292 Kan. No. 4 (XI) (Sept. 21, 2011).

Viewing the contract as a whole, using common sense and not straining to create ambiguity, the court finds the coverage clause to be clear and unambiguous and reads the same according to its plain, ordinary and popular sense.  "**Insured person** as used in this Part means: . . . **You** or any **relative** for the ownership, maintenance or use of any **car** or **utility trailer**."  There is nothing in the wording or punctuation of this particular sentence that necessarily leads one to read this concluding preposition as modifying only "relative."  In defining "insured person," the policy lays out four subsections each of which identifies those persons and entities that are included in that subsection and then imposes additional conditions or limitations common to all persons and entities in that subsection.  The plaintiffs' proposed reading breaks that pattern.  The court is not persuaded that the content and context of the insuring agreement offers a plausible

16

reason for distinguishing between a named insured and relative over this basic scope of coverage.  For that matter, the punctuation and wording used elsewhere in the insuring agreement do not support such a reading.    In the opening paragraph of the insuring agreement, there are other instances of phrases or clauses that follow objects separated by "or," and the phrases or clauses consistently modify both objects.[2]  If the plaintiffs' approach were applied to these sentences in the opening coverage paragraph alone, the policy would be rendered illogical and implausible.  Employing this interpretative approach would seem to frustrate the parties' intent.

For support of their interpretation, the plaintiffs look to the general doctrine of last antecedent which provides that "relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote."  *Liberty Life Ins. Co. v.* Guthrie, 148 Kan. 907, 84 P.2d 891, 892 (1938).   The Tenth Circuit recently summarized Kansas law on this doctrine recognizing that its application was constrained by the plain terms of a policy:

> As Payless itself concedes, however, this last antecedent principle is merely an interpretive presumption based on the grammatical rule against misplaced modifiers. Operating on the assumption that most

---

[2] Examples include:  "We will pay damages for bodily injury <u>or</u> property damage <u>for</u> which any insured person becomes legally responsible because of a car accident," and "We have no duty to defend any suit <u>or</u> settle any claim <u>for</u> bodily injury or property damage not covered under this policy."

contracts follow most rules of grammar, courts tend to prefer interpretations that conform to those rules. At the same time, though, we know that grammatical rules are bent and broken all the time, and we will not enforce the more grammatical interpretation of a contract "when evident sense and meaning require a different construction." *Link, Inc. v. City of Hays*, 266 Kan. 648, 972 P.2d 753, 758 (1999) (internal quotation mark omitted). Or, as the United States Supreme Court has put it, the last antecedent presumption "can assuredly be overcome by other indicia of meaning." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 355, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) (internal quotation marks omitted). Given how common misplaced modifiers are in daily usage, the Supreme Court has candidly acknowledged that "[o]ver the years, such indicia have counseled us against invoking the rule (often unanimously) at least as many times as we have relied on it." *Id.*; *accord Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

All this underscores that, while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of any analysis of the parties' plain meaning. So it is that Groucho Marx could joke in Animal Crackers, "One morning I shot an elephant in my pajamas. How he got into my pajamas I'll never know," leaving his audience at once amused by the image of a pachyderm stealing into his night clothes and yet certain that Marx meant something very different. In the more mundane task of contract interpretation, we must be no less entitled to acknowledge the parties' plain meaning without being strait-jacketed by a grammatical rule into reaching a patently unintended result. *See Link*, 972 P.2d at 758 ("[I]f application of the last antecedent rule would involve an absurdity, do violence to the plain intent of the language, or if the context for other reason requires a deviation from the rule, it will be necessary and proper to look for another antecedent.") (internal quotation marks omitted).

*Payless Shoesource, Inc. v. Travelers Companies, Inc.*, 585 F.3d 1366,

1371-72 (10th Cir. 2009).   For the reasons stated above, the court believes

the blanket application of this doctrine here is contrary to the grammatical

18

structure used in related language, and it would frustrate the plain terms of the policy.

Contrasting the original policy's terms of coverage with the endorsement's insuring agreement, the plaintiffs assume a change in the definition of "insured person" for the purpose of extending coverage.  The plaintiffs cite no authority for the proposition that endorsements are made only to extend coverage and, therefore, should be construed to accomplish that sole purpose.  Nor do the plaintiffs offer evidence supporting such a purpose for the endorsement here and the assumption in their argument. On the face of the relevant terms of the endorsement, the most apparent change from the policy's terms is to require the legal responsibility of the insured person, not just the named insured, to arise from "a car accident." Simply because it did not change the coverage from being "for the ownership, maintenance, or use," the endorsement is not rendered meaningless in that it now apparently limits coverage to car accidents.  In short, there is no ambiguity in this definition of insured person that requires a liberal construction in the insured's favor.

Finally, the plaintiffs contend that NFU has waived the denial of coverage based on the definition of "insured person," because it was not preserved in Ms. LeDoux's coverage denial letter.  The plaintiffs rely on the Kansas Supreme Court decision in *Pacific Indemnity Co. v. Berge*, 205 Kan.

19

755, 767, 473 P.2d 48 (1970), in which the insurer delayed in asserting that the insured had failed to make a timely proof of loss, and the Court found the insurer waived this ground for denial and applied this rule:  "Where an insurer bases its refusal to pay a loss upon a forfeiture or failure to comply with particular condition it cannot thereafter maintain a defense based upon another condition not referred to in such refusal to pay and of which it then had knowledge."  205 Kan. 767 (citations omitted).  In short, the plaintiffs are seeking to use waiver for a judicial rewriting of the auto policy's coverage.

NFU correctly argues that the waiver rule from *Berge* will not create coverage where it does not exist.  As the Kansas Court of Appeals has recognized, "an insured's failure to comply with a policy condition may be waived, but generally waiver and estoppel will not expand a policy's coverage."  *Russell v. Farmers Ins. Co., Inc.*, 38 Kan. App. 2d 290, 292, 163 P.3d 1266, 1268-69 (2007);[3] *see Hennes Erecting Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 813 F.2d 1074, 1079-80 (10th Cir. 1987) (*Berge* and related cases "establish that an insurer, basing a refusal to pay a loss entirely on one ground of forfeiture, could not then maintain a defense of

---

[3] The *Russell* court cites the following cases in support of this rule:  *Unruh v. Prudential Prop. and Cas. Ins. Co.*, 43 F. Supp. 2d 1237, 1239–40 (D. Kan. 1999) (applying Kansas law); *Aks v. Southgate Trust Co.*, 844 F. Supp. 650, 659 (D. Kan. 1994) (same); *Allied Mut. Ins. Co. v. Moeder*, 30 Kan. App. 2d 729, Syl. ¶ 6, 48 P.3d 1 (2002); *Hillman v. Colonial Penn Ins. Co.*, 19 Kan. App. 2d 375, 377, 869 P.2d 248, *rev. denied*, 255 Kan. 1001 (1994).

forfeiture based [on] the violation of another policy provision." (citations omitted).   NFU's denial here is not based on the insured's forfeiture of coverage or insured's failure to comply with a policy condition for which coverage otherwise exists.  That NFU failed to cite the endorsement or its definition of insured person does not entitle the plaintiffs to now have the policy's coverage expanded so that the Valeks meet the definition of insured person.  Thus, if coverage does not exist, the insurer has no duty to defend and the insured cannot create such an obligation.  *South Central Kansas Health Ins. Group v. Harden & Co. Ins. Services, Inc.*, 278 Kan. at 353.  NFU is entitled to summary judgment that the auto policy does not cover the negligent entrustment liability of William Valek.

<u>Coverage under NFU Farm Policy</u>

NFU's coverage denial letter cited the following exclusion from its Farm Policy:

> This insurance does not apply to:
> . . . .
> **e.  Aircraft, Motor Vehicle, Motorized Bicycle or Tricycle**
>    "Bodily injury" or "property damage":
>    (1)   Arising out of ownership, maintenance, use or entrustment to others of any aircraft, "motor vehicle", motorized bicycle or tricycle owned or operated by or rented or loaned to any "insured".  Use includes operation and "loading or unloading"; or
>    (2)   Giving rise to vicarious liability, whether or not imposed by law, for the actions of a child or minor involving any aircraft, "motor vehicle", motorized bicycle or tricycle.

21

> This exclusion applies even if the claims against any "insured" allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that "insured", if the "occurrence" that caused the "bodily injury" or "property damage" involved the ownership, maintenance, use, or entrustment to others of any aircraft, "motor vehicle", motorized bicycle or tricycle that is owned or operated by or rented or loaned to any "insured".

(Dk. 45, Ex. 5, NFU 241-42).

### Coverage for K.S.A. § 8-222 Joint and Several Liability

For the same reasons stated above, the court finds William Valek's joint and several liability arises from being imputed with his minor son's negligence in operating the 1988 Camaro and is not based on his own negligence or wrong independent of his son's negligent operation.  The exclusion for liability "[a]rising out of . . . use . . . of any 'motor vehicle' . . . owned . . . by . . . any 'insured'" eliminates coverage for William Valek's liability under K.S.A. § 8-222.

### Coverage for Negligent Entrustment Liability

The plaintiffs concede "the Farm policy clearly and unequivocally excludes those portions of the judgments attributable to negligent entrustment."  (Dk. 47, p. 26).

**CONCLUSION**

Because there is no coverage for the liability of William Valek or Jacob Valek under NFU's auto and farm policies, NFU did not act negligently or in bad faith in denying coverage, in failing to defend, and in not settling

the plaintiffs' claims. "Under the ultimate showing test, an insurer's duty to defend is dependent on a showing that the defendant to the action is insured under the policy." *South Central Kansas Health Ins. Group*, 278 Kan. at 353. The Kansas Supreme Court applied the ultimate showing test adopted by the Kansas Court of Appeals in *Williams v. Community Drive-In Theatre, Inc.*, 3 Kan. App. 2d 353, 355, 595 P.2d 724, *rev. denied*, 226 Kan. 793 (1979):

> The *Williams* court stated that "the plaintiff may not create an obligation on the part of the insurer where no obligation previously existed." 3 Kan. App. 2d at 354. Quoting the Arizona Court of Appeals, the *Williams* court justified the ultimate showing test, stating:
>> "'If an insurer erroneously takes the position that notwithstanding the allegations of the complaint it has no obligation to defend, and facts subsequently establish that such duty did exist, then we are confident that the law will allow the injured party an adequate remedy for the breach by the insurer of its obligations under the policy. (See the many cases affording such a remedy cited in Annot., 50 A.L.R.2d 461 [1956] ). On the other hand, if the insurer's position is ultimately shown to be correct, then it should not be penalized by being forced to bear an expense which it did not contractually obligate itself to incur.'" 3 Kan. App. 2d at 355 (quoting *Navajo Freight Lines, Inc. v. Liberty Mutual Ins. Co.*, 12 Ariz. App. 424, 431, 471 P.2d 309, rev. denied October 20, 1970).
>
> Although the *Williams* court applied the ultimate showing test to a determination of whether the defendant was a named insured under the policy, the same reasoning applies to the determination of whether the claim is covered by the policy. Although it was not specifically termed as the ultimate showing test, the same reasoning was used by the *Spruill* court when it limited its holding based on its conclusion that the claim was covered and by the *Spivey* and *Steinle* courts when they concluded that the insurer did not have a duty to defend because there was no coverage under the insurance policy. See *Steinle* [*v. Knowles*], 265 Kan. [545] at 555, 961 P.2d 1228 [(1998)]; *Spivey* [*v. Safeco Ins. Co.*], 254 Kan. [237] at 250–51, 865 P.2d 182 [(1993)]; *Spruill*

23

[*Motors, Inc. v. Universal Underwriters Ins. Co.*], 212 Kan. [681] at 686, 512 P.2d 403 [(1973)].

Likewise, the reasoning of the ultimate showing test applies in this case. When there is no coverage under the insurance policy, there is no duty to defend.

*South Central Kansas Health Ins. Group*, 278 Kan. at 353.  As the Kansas Court of Appeals has since noted, "[t]he ultimate showing test discussed in *South Central Kansas Health Ins. Group* was not abandoned or modified by the Supreme Court in *Westport*."[4]  *Hackman v. Western Agr. Ins. Co.*, 251 P.3d 113 (Kan. App. May 6, 2011)(unpub.), *rev denied*, 293 Kan. No. 3  (V) (Jan. 20, 2012).  NFU is entitled to judgment on the plaintiffs' bad faith insurance claims.

IT IS THEREFORE ORDERED that the defendant NFU's motion for summary judgment (Dk. 44) is granted;

IT IS THEREFORE ORDERED that the plaintiffs' motion for summary judgment and request for oral argument (Dk. 46) is denied.

Dated this 10th day of July, 2012, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

---

[4] *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 200 P.3d 419 (2009).